[Cite as *State v. Jenkins*, 2018-Ohio-3697.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 27701 |
| | : | |
| v. | : | Trial Court Case No. 2017-CRB-113 |
| | : | |
| MYCHAEL JENKINS | : | (Criminal Appeal from Municipal Court) |
| | : | |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 14th day of September, 2018.

. . . . . . . . . . .

MATTHEW KORTJOHN, Atty. Reg. No. 0083743, Assistant Prosecuting Attorney, City of Dayton Prosecutor's Office, 335 West Third Street, Suite 372, Dayton, Ohio 45402
        Attorney for Plaintiff-Appellee

JAY A. ADAMS, Atty. Reg. No. 0072135, 36 North Detroit Street, Suite 102, Xenia, Ohio 45385
        Attorney for Defendant-Appellant

. . . . . . . . . . . . .

TUCKER, J.

{¶ 1} Defendant-appellant Mychael Jenkins appeals from his conviction and sentence for domestic violence. He contends that the State did not present evidence sufficient to sustain the conviction and that the conviction was not supported by the weight of the evidence. He further contends that the State violated his Fifth Amendment right to remain silent by using, as substantive evidence during the State's case-in-chief, his pre-arrest refusal to respond to investigating officers.

{¶ 2} We conclude it was error to permit the State to utilize Jenkins's pre-arrest silence as substantive evidence. However, since we also conclude there was overwhelming evidence of Jenkins's guilt, the error was harmless beyond a reasonable doubt. Further, Jenkins's conviction was supported by sufficient evidence, and it was not against the manifest weight of the evidence.

{¶ 3} Accordingly, the judgment of the trial court is affirmed.

## I. Facts and Procedural History

{¶ 4} This case arises from an altercation that took place between Jenkins and Jade Hamilton on January 6, 2017. Following an investigation, Jenkins was charged with one count of domestic violence and one count of assault. A jury trial was conducted on July 20, 2017.

{¶ 5} During trial, Hamilton testified that she took her six-month old son to Dayton Children's Hospital because he had a slight fever, would not nurse, and was not producing any wet diapers. Hamilton testified that Jenkins is the father of the child. She testified that she called and texted Jenkins to let him know that the child was ill and that she was

taking him to the hospital. By the time Jenkins arrived at the hospital with his girlfriend, Desaray Webb, the child was in the process of being discharged.

{¶ 6} Hamilton testified that when Jenkins entered the examination room, he grabbed her by the wrist and tried to take the baby from her arms. She testified that she told him to let go but he merely stated that she should hand him the baby. Hamilton testified that she began to yell at Jenkins and again told him to release her. She testified that he initially complied, but, as they were exiting the examination room, Jenkins again grabbed her by the wrist. According to Hamilton, Jenkins pushed, tugged and shoved her, and she was unable to get free from what she described as a "tight grip." She testified that her wrist was "really aching" during the encounter and that she woke up the next day feeling sore all over and her wrist was hurting.

{¶ 7} Stephanie Maniaci, an emergency room nurse at Dayton Children's Hospital, testified that she was in the process of discharging Hamilton and her son when she heard yelling. Maniaci testified that, as she turned a corner, she observed Hamilton holding her child and Jenkins holding Hamilton's wrists and forcing them down. She testified that she attempted to retrieve the child from Hamilton's arms and that she tried to get Jenkins's hands off of Hamilton. Maniaci testified that Jenkins was too strong and she was unable to break his grip on Hamilton. Maniaci testified that she was able to get the child, after which she told another nurse to call security. Maniaci testified that Jenkins did not release Hamilton, and that she observed another woman, standing behind Jenkins, hit Hamilton in the face hard enough to knock Hamilton's glasses to the floor.

{¶ 8} Sergeant Merle Davies testified that he was the security officer who responded to the scene. He testified that he verbally told Jenkins and Hamilton to stop,

but that they did not comply. He testified that Jenkins had his hands on Hamilton's arm. Davies testified that he had to physically push Hamilton in order to get the two apart. Webb and Jenkins then left the scene. He testified that he and another security officer followed Jenkins to the hospital parking garage where they attempted to ask him questions about his involvement in the incident. According to Davies, Jenkins refused to respond to any questions. Davies testified that he detained Jenkins until Dayton Police Department officers responded to the scene.

{¶ 9} Webb testified that Hamilton was trying to attack her and that Jenkins merely stepped between the two women to prevent Hamilton from harming Webb, who was pregnant at the time. Webb testified that she was attempting to pull Jenkins toward the exit when Hamilton hit her. She testified that Hamilton attempted to hit her three times, and in fact, hit Webb's head. She testified that she then hit Hamilton.

{¶ 10} Jenkins was convicted of domestic violence, however, the jury acquitted him on the charge of assault. The trial court sentenced Jenkins to 180 days in jail with 135 days suspended. Jenkins appeals.

## II. Fifth Amendment Analysis

{¶ 11} Jenkins asserts the following for his first assignment of error:

THE PROSECUTION VIOLATED APPELLANT'S CONSTITUTIONAL RIGHTS BY IMPROPERLY COMMENTING ON HIS RIGHT TO REMAIN SILENT.

{¶ 12} Jenkins contends that the State violated his Fifth Amendment rights when it introduced evidence that he refused to speak to the security personnel who detained

him in the hospital parking garage immediately following the altercation. He argues that the State improperly used his silence when confronted by police officers as evidence of guilt.[1] Jenkins argues that the use of the evidence was prejudicial because the record contains two different versions of the events leading to his arrest, and that because he remained silent, the jury chose not to credit his witness's version.

{¶ 13} The State contends that Jenkins did not invoke his right to remain silent and that he did not properly object to the testimony of Sergeant Davies at trial. The State further argues that the evidence was used to show Jenkins's consciousness of guilt, as evidenced by the fact that he left the scene and would not cooperate.

{¶ 14} In *State v. Leach*, 102 Ohio St.3d 135, 2004-Ohio-2147, 807 N.E.2d 335, the Ohio Supreme Court held that the "use of a defendant's pre-arrest silence as substantive evidence of guilt violates the Fifth Amendment privilege against self-incrimination." *Id.* at ¶ 38. The court expounded by stating that the "[u]se of pre-arrest silence in the state's case-in-chief would force defendants either to permit the jury to infer guilt from their silence or surrender their right not to testify and take the stand to explain their prior silence." *Id.* at ¶ 31. The court further explained that the State "presented testimony that Leach, who had not yet been arrested or *Mirandized*, remained silent and/or asserted his right to counsel in the face of questioning by law enforcement. This testimony was clearly meant to allow the jury to infer Leach's guilt. Otherwise, jurors might reason, Leach would have offered his version of events to law enforcement." *Id.* at ¶ 25. The *Leach* court, however, stated that such evidence could be used for

---

[1] The record demonstrates that the hospital security personnel who confronted Jenkins are sworn Dayton Special Police Officers with the same law enforcement protocols as officers working for the Dayton Police Department.

legitimate purposes such as impeachment after the defendant had already elected to testify.   *Id.* at ¶ 33.

**{¶ 15}** In this case, the State used the evidence in its case-in-chief.   The State argues that it was admissible to prove evidence of a guilty conscience based upon the fact that Jenkins fled the scene.   However, the evidence regarding Jenkins's flight from the scene could have been admitted without reference to his silence in response to questioning.   We, thus, conclude that the admission of Jenkins's pre-arrest silence during the State's case-in-chief violated his Fifth Amendment right against self-incrimination.

**{¶ 16}** However, this does not end our inquiry.   In *Leach*, the court went on to find that "[b]ecause the evidence of guilt was not overwhelming in this case, the admission of defendant's pre-arrest, pre-*Miranda* silence was clearly prejudicial."   *Id.* at ¶ 38.   Thus, the court effectively conducted a harmless error analysis, which provides that evidence "improperly admitted in derogation of a criminal defendant's constitutional rights * * * is harmless 'beyond a reasonable doubt' if the remaining evidence alone comprises 'overwhelming' proof of defendant's guilt."   *State v. Williams*, 6 Ohio St.3d 281, 290, 452 N.E.2d 1323 (1983), citing *Harrington v. California*, 395 U.S. 250, 254, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969).

**{¶ 17}** While Webb's version did differ from that of Hamilton and Maniaci, the evidence in this case does not consist merely of witnesses with competing stories, as Jenkins claims.   As noted, the evidence included a videotape which supported the testimony of Hamilton.   Moreover, Maniaci was a disinterested witness whose testimony aligned with that of Hamilton.   Thus, we conclude that the improperly admitted evidence

of Jenkins's silence was harmless beyond a reasonable doubt based upon the overwhelming evidence of Jenkins's guilt.

**{¶ 18}** The first assignment of error is overruled.

### III. Sufficiency and Manifest Weight Analysis

**{¶ 19}** The second assignment of error raised by Jenkins states:

THE VERDICT OF THE JURY IS NOT SUPPORTED BY THE LEGAL SUFFICIENCY AND WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

**{¶ 20}** Jenkins contends that the State did not present evidence sufficient to support a conviction for domestic violence. He further claims that the conviction was not supported by the weight of the evidence.

**{¶ 21}** "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997). We apply the test from *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), which states that:

An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most

favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

(Citation omitted). *Id.* at paragraph two of the syllabus.

{¶ 22} When reviewing a weight of the evidence challenge, a court reviews "the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 23} Further, while "sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis; that is, a finding that a conviction is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency." (Citations omitted.) *State v. McCrary*, 10th Dist. Franklin No. 10AP-881, 2011-Ohio-3161, ¶ 11. *Accord State v. Robinson*, 2d Dist. Montgomery No. 26441, 2015-Ohio-1167, ¶ 17. Accordingly, "a determination that a conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." (Citations omitted.) *State v. Braxton*, 10th Dist. Franklin No. 04AP-725, 2005-Ohio-2198, ¶ 15.

{¶ 24} Additionally, "[b]ecause the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The

decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997). "The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence." *State v. Adams*, 2d Dist. Greene Nos. 2013-CA-61 and 2013-CA-62, 2014-Ohio-3432, ¶ 24.

**{¶ 25}** Domestic violence is proscribed by R.C. 2919.25(A), which states that "[n]o person shall knowingly cause or attempt to cause physical harm to a family or household member." A family or household member includes "[t]he natural parent of any child of whom the offender is the other natural parent or is the putative other natural parent." R.C. 2929.25(F)(1)(b).

**{¶ 26}** Jenkins first argues that his conviction must be reversed because the State failed to prove that Hamilton was a family or household member as there was no "legal proof" that he was the father of Hamilton's child. He notes that there was no evidence that he had admitted to paternity or that he had been shown to be the father through DNA testing. Thus, he contends that the jury found him to be the child's father without sufficient proof.

**{¶ 27}** However, the domestic violence statute did not require the State to prove he was actually the father of Hamilton's child. Instead, the statute permitted the State to submit proof that he was the putative father. "A putative father is defined as a man who may be a child's father and: 1) is not married to the mother at birth or conception; 2) has not adopted the child; 3) whom no court or government agency has determined to have a parent/child relationship with the child; and, 4) has not acknowledged paternity of the

child." *In re K.M.S.*, 2d Dist. Miami No. 05CA17, 2005-Ohio-4739, ¶ 7, citing R.C. 3107.01(H). *See also Black's Law Dictionary* 648 (5th Ed. 1983) (defining a putative father as "the alleged or reputed father of" a child).

**{¶ 28}** Hamilton testified that Jenkins was the father of her child. Jenkins's niece, Heaven Jenkins, also testified that Jenkins was the father of Hamilton's child. Jenkins's girlfriend, Desaray Webb, testified that Jenkins said the baby was "possibly" his child. Tr. p. 310. She also testified that Jenkins referred to the child as his son and that Jenkins contributed to the upbringing of the child. Jenkins's appearance at Dayton Children's Hospital, where only the child was being treated, tends to corroborate his parenthood. The jury could have reasonably found that Jenkins was the putative father. Thus, we conclude that there was sufficient evidence in this record to support a finding that Jenkins was the child's putative father and that Hamilton was, therefore, a family of household member.

**{¶ 29}** Next, Jenkins claims that the evidence presented at trial did not support a finding that he knowingly caused physical harm to Hamilton. "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist." R.C. 2901.22(B). Physical harm is defined as "any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3).

**{¶ 30}** Hamilton, Maniaci and Davies all testified that Jenkins had his hands on Hamilton. Hamilton and Maniaci indicated that Jenkins was jerking, pushing and tugging Hamilton. Maniaci testified that Jenkins had such a strong grip on Hamilton that she was

unable to "budge" him. Hamilton testified that her wrist was hurting from Jenkins's grip. In addition, the State submitted a videotape from a surveillance camera at Dayton Children's Hospital. The videotape showed the parties in the hallway beside the examination room. From the beginning of the video, Jenkins clearly had his hands on Hamilton, and he could be seen pushing her around the hallway. Webb could be observed moving toward the couple during the altercation. Maniaci could be observed intervening and eventually pulling the baby out of the way. It also appeared that Webb tried to pull Jenkins toward the exit. However, as the altercation continued, Webb could be seen hitting Hamilton. It appeared that Jenkins had a grip on Hamilton for the duration of the incident until security intervened.

{¶ 31} The videotape, combined with the testimony of Hamilton and Maniaci, was sufficient for a reasonable juror to conclude that Jenkins should have been aware that his conduct could result in physical harm to Hamilton. Further, Hamilton's testimony that her wrist was hurt and her body was sore after the incident was enough to sustain a finding of physical harm.

{¶ 32} Finally, Jenkins argues that the jury erred by not accepting his claim that he was acting in defense of another by preventing Hamilton from harming Webb. He claims that the evidence supported a finding that Hamilton was the aggressor and that he acted merely in defense of Webb. In support, he cites evidence indicating that Hamilton was upset that Webb came to the hospital. He further contends that Hamilton, upon entering the hallway, turned on Webb. Webb also testified that Hamilton, after exiting the exam room, turned toward her and said, "you know what," at which time Jenkins grabbed Hamilton. When asked if Hamilton did anything to suggest violence, Webb stated, "[w]hy

would she be walking towards me, if she wasn't trying to be violent?" Webb testified that Jenkins was simply pushing Hamilton away from her.

{¶ 33} Maniaci and Johnson testified that it did not appear that Jenkins was acting to defend Webb against Hamilton. Further, a reasonable juror watching the videotape could have concluded that there was no evidence that Hamilton acted aggressively toward Webb. Indeed, Webb could be observed walking toward Hamilton and Jenkins each time Jenkins pushed Hamilton down the hallway.

{¶ 34} We conclude that the jury did not lose its way in rejecting Jenkins's claim of defense of others. There is nothing in this record, other than Webb's testimony that Hamilton walked toward her, to suggest that Hamilton was the aggressor. Further, Webb continued to intervene in the altercation by pulling Jenkins toward the exit and by eventually hitting Hamilton. It is not clear from the videotape that Hamilton ever tried to hit Webb, and based upon our review of the tape, we cannot say that the jury lost its way in rejecting Webb's testimony.

{¶ 35} Based upon our review of the record, we conclude that there was sufficient evidence upon which a reasonable juror could find Jenkins guilty of domestic violence. We further conclude, consistent with our Fifth Amendment overwhelming evidence conclusion, that the conviction was not against the manifest weight of the evidence.

{¶ 36} Accordingly, the second assignment of error is overruled.


### IV. Conclusion

{¶ 37} Both of Jenkins' assignments of error being overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .


WELBAUM, P.J. and FROELICH, J., concur.


Copies mailed to:

Matthew Kortjohn
Jay A. Adams
Hon. Christopher D. Roberts