[Cite as *State v. Woodruff*, 2024-Ohio-4926.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 2024-CA-11 |
| | : | |
| v. | : | Trial Court Case No. 22 CR 0503 |
| | : | |
| ROBERT LAMAR WOODRUFF | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on October 11, 2024

. . . . . . . . . . .

STEVEN H. ECKSTEIN, Attorney for Appellant

ROBERT C. LOGSDON, Attorney for Appellee

. . . . . . . . . . . .

EPLEY, P.J.

{¶ 1} Defendant-Appellant Robert Lamar Woodruff appeals from his conviction in the Clark County Court of Common Pleas after he was found guilty of kidnapping (with a

firearm specification), having a weapon while under disability, and domestic violence. He was sentenced to an aggregate term of 6 to 7½ years in prison. For the reasons that follow, the judgment of the trial court will be affirmed.

## I.     Facts and Procedural History

{¶ 2} T.H. and Woodruff had been in an on-again-off-again romantic relationship for more than 20 years.   On June 5, 2022, Woodruff was visiting T.H. at her home in Springfield, which she shared with her five-year-old grandson. T.H. testified that at some point that afternoon, Woodruff "flipped out" and "came up the stairs and started beating on [her]." Trial Tr. at 253. According to T.H., Woodruff beat her with his fist and hit her in the head with a gun that he had brought with him. "He was calling me bitch. He was saying he was tired of me. He was saying he was going to take me out. He was saying he hated me." Trial Tr. at 255.

{¶ 3} According to T.H., the beatings lasted for an hour or two until she called her grandmother to pick up her grandson, who had been outside playing. When the grandmother arrived, Woodruff took the boy out to meet her because he would not let T.H. go outside. Woodruff also confiscated T.H.'s cell phone. After the grandson was gone, T.H. stated that "[h]e came back in the house and beat me some more . . . started throwing me up the stairs, beat me in the bathroom. That's when he hit me in the side of the head with the gun." Trial Tr. at 258.

{¶ 4} Around 5:00 or 6:00 p.m., T.H. lay down on her bed.   The next thing she remembered, her room was pitch-black, it was 3:00 a.m., and her grandson was sleeping next to her. T.H. retrieved her phone, called her mother, and asked her to get the police

to do a wellness check.

{¶ 5} With the boy still sleeping in the bed, T.H. put on her shoes and quietly went downstairs. Once on the first level, she saw Woodruff sitting on the couch with a gun beside him. She testified that she planned to escape by pretending to take out the trash; she hoped that when she opened up the back door, it would obstruct Woodruff's view enough to get away. As she was exiting out the back, T.H. heard the police knock on the front door. With the unexpected noise as cover, T.H. ran outside of the house toward the officers. She did not take her grandson, who was still asleep upstairs.

{¶ 6} After learning from T.H. that her grandson was still in the house, officers attempted to make contact with Woodruff. When he would not surrender or send the child out, the SWAT team was assembled, and units arrived around 5:30 a.m. Officers spent the next several hours negotiating with Woodruff to send out the boy. Woodruff told Detective Charles Adams, the SWAT hostage negotiator, that he would release T.H.'s grandson after he had spoken with his mother on the phone and after he had finished writing letters to family members. Even though Woodruff initially reneged on his promise to let the boy go after his conditions were met, the child was released in the afternoon. The focus then turned to securing Woodruff.

{¶ 7} Detective Adams remained in contact with Woodruff throughout the afternoon but was unable to convince him to surrender; when Woodruff began talking about taking his own life or committing "suicide by cop," the decision was made to send in tear gas to force him out of the house. While the tear gas was not initially effective, Woodruff eventually gave himself up after a 12-hour SWAT standoff.

{¶ 8} As a result of the incident, Woodruff was charged by way of indictment with kidnapping (Count 1); abduction (Count 2); having a weapon while under disability (Count 3); domestic violence (Count 4); and child endangering (Count 5); Counts 1, 2, and 4 had attendant firearm specifications. After several months, the case proceeded to trial on January 9-11, 2024. At the conclusion, the jury found Woodruff guilty of kidnapping and the attached firearm specification, having a weapon while under disability, and domestic violence. The jury, however, found him not guilty of abduction and the firearm specification from the domestic violence count. The court dismissed Count 5 (child endangering) on Woodruff's Crim.R. 29 motion for acquittal.

{¶ 9} Woodruff was sentenced to 3 to 4½ years in prison for kidnapping, plus 3 years on the firearm specification (which was to be served prior to and consecutively to the sentence for kidnapping). Additionally, the court imposed two-year sentences each for having weapons while under disability and domestic violence, to be served concurrently with each other and with the sentence for kidnapping. Woodruff's aggregate prison term was 6 to 7½ years.

{¶ 10} Woodruff has filed a timely appeal with two assignments of error.

## II.     Sufficiency of the Evidence

{¶ 11} In his first assignment of error, Woodruff alleges that there was insufficient evidence for his convictions for having a weapon while under disability and the firearm specification attached to the kidnapping count. We disagree.

{¶ 12} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to

determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Marshall*, 2010-Ohio-5160, ¶ 52 (2d Dist.), quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id*. A conviction based on legally insufficient evidence constitutes a denial of due process and will bar a retrial. *State v. Thompkins*, 78 Ohio St.3d 380, 386-387 (1997).

Having A Weapon While Under Disability

{¶ 13} To obtain a conviction for having a weapon while under disability, the State must prove that the defendant (1) is either under indictment for or has been convicted of any felony offense of violence, and (2) knowingly acquired, had, carried, or used any firearm or dangerous ordinance. R.C. 2923.13(A)(2). Additionally, the State must prove beyond a reasonable doubt that "the firearm was operable or could readily have been rendered operable at the time of the offense." *State v. Priest*, 2011-Ohio-4694, ¶ 51 (2d Dist.); R.C. 2923.11.

{¶ 14} In this case, the record contains evidence that Woodruff had several convictions for felony offenses of violence, including two in Montgomery County for domestic violence. *State v. Woodruff*, Montgomery C.P. No. 2012 CR 02951 (Jan. 28, 2013); *State v. Woodruff*, Montgomery C.P. No. 2020 CR 02758 (Dec. 31, 2020). There was also testimony from Detective Adams (the hostage negotiator) that during the standoff, Woodruff informed him that he had a firearm, and when he was asked what kind

it was, Woodruff answered: "What does it matter? I'm a felon in possession of a gun." Trial Tr. at 394-395. Based on the record, we conclude that there was sufficient evidence that Woodruff had been convicted of a felony offense, meeting the first element.

{¶ 15} T.H. testified several times that she saw Woodruff with a gun between June 5 and 6, 2022. Not only did T.H. tell the jury that she saw him with the gun, but she also testified that he beat her with it. Trial Tr. at 258, 261-262, 313. A SWAT team member also saw him with a gun. Officer Colin Peterson, who was the technology expert on the SWAT team, testified that one of his duties during the standoff was to control the drones and robots. According to Peterson, after the child was out of the house, a robot and a drone were sent in; he observed, through the robot's camera, that Woodruff had a firearm in his hand. Trial Tr. at 482-483, 488. On cross-examination, Officer Peterson noted that he was 100% sure Woodruff had had a gun. Woodruff himself told Detective Adams that he did. Based on the trial testimony, we conclude there was sufficient evidence for the jury to believe Woodruff possessed a gun.

{¶ 16} Finally, the State proved that the gun was operable or could have been made operable. To this point, though, Woodruff argues that there is some discrepancy in the identification of the firearm. For instance, Detective Joshua Lish testified that the gun recovered from the scene, photographed, and placed into evidence was a Glock 9-millimeter pistol with an extended magazine and no serial number. *See* State's Exhibits 44, 45, 46, 47 (pictures of the gun at the scene); 58, 59, 60 (gun and ammo). However, Sergeant Doug Pergram, the officer who test-fired the gun and determined that it was operable, identified the weapon (both on the stand and in the report) as a Polymer 80,

model PF940C, 9-millimeter pistol.

{¶ 17} Despite the fact that the officers called the handgun by different brand names, it is clear that they were talking about the same weapon. Detective Lish opened the envelope containing Exhibit 58 on the stand and identified the gun as the same one found and collected at the scene and the same one seen in the pictures (Exhibits 44-47). Likewise, Sergeant Pergram identified the gun in Exhibit 58 as the one he test-fired and found was operable. The jury was able to compare the gun in Exhibit 58 to that of the one at the scene and reasonably determined it was the same. Viewing the evidence in a light most favorable to the State, a rational juror could have found the essential elements of having a weapon while under disability proven beyond a reasonable doubt.

Firearm Specification

{¶ 18} A firearm specification requires proof "that the offender had a firearm on or about the offender's person or under the offender's control while committing the offense and displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense." R.C. 2941.145(A); *State v. Thaler*, 2020-Ohio-827, ¶ 14 (2d Dist.). The State must also prove beyond a reasonable doubt that the firearm was operable or could readily have been rendered operable at the time of the offense. *State v. Stokes*, 2021-Ohio-3616, ¶ 34 (2d Dist.). Circumstantial evidence can support a finding of the weapon's existence and/or operability. *Id.* at ¶ 36; *State v. Greathouse*, 2007-Ohio-2136, ¶ 19 (2d Dist.).

{¶ 19} As to the firearm specification, Woodruff's claim is the same as above – there was a discrepancy with the identification of the gun. This argument has no merit;

the two officers were talking about the same firearm. Woodruff's first assignment of error is overruled.

### III. Manifest Weight of the Evidence

{¶ 20} In his second assignment of error, Woodruff asserts that his convictions for domestic violence, having a weapon while under disability, and Count One's firearm specification were against the manifest weight of the evidence.

{¶ 21} When an appellate court reviews whether a conviction is against the manifest weight of the evidence, "[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins*, 78 Ohio St.3d at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). A case should not be reversed as being against the manifest weight of the evidence except " 'in the exceptional case in which the evidence weighs *heavily* against the conviction.'" (Emphasis added.) *Id.*

{¶ 22} "When engaged in this limited reweighing, the appellate court may not merely substitute its view for that of the trier of fact[.]" *State v. Thompson*, 2017-Ohio-8375, ¶ 25 (10th Dist.). "It is well-established that when conflicting evidence is presented at trial, a conviction is not against the manifest weight of the evidence simply because the trier of fact believed the prosecution testimony." *In re M.J.C.*, 2015-Ohio-820, ¶ 35 (12th Dist.). This Court will not substitute its judgment for that of the trier of fact on the issue of witness credibility "unless it is patently apparent that the trier of fact lost its way in arriving

at its verdict." *State v. Smith*, 2013-Ohio-5345, ¶ 16 (2d Dist.).

{¶ 23} Woodruff's sole argument regarding having a weapon while under disability and domestic violence were against the manifest weight of the evidence is that T.H.'s testimony was unreliable and incredible. He claims the only evidence that supported the convictions was her testimony, and he highlights the fact that she had a criminal history of crimes of dishonesty like identity fraud and counterfeiting. We disagree.

<u>Domestic Violence</u>

{¶ 24} R.C. 2919.25(A), the domestic violence statute, prohibits a person from knowingly causing or attempting to cause physical harm to a family or household member. Our analysis begins with whether Woodruff caused physical harm to T.H. "Physical harm means any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3). Evidence presented at trial indicated that Woodruff began his assault on T.H. in the afternoon of June 5. T.H. told the jury that he called her names, threatened to "take [her] out," and beat her with his fists and his gun. Further, T.H. testified that Woodruff threw her up the stairs. The physical effects of the assault were noted, not just by T.H., but by several officers who came in contact with her. Detective Charles Adams told the jury that T.H. was shaken up and had visible injuries to her face. Officer Ryan Bower, who was the first to see T.H. after she escaped the house, testified that when he saw her, "she looked disheveled. She had lacerations on her face. She had blood dripping down her - I can't remember if it was a nightgown or a t-shirt." Trial Tr. at 221. He further testified that her nose was bruised. Officer Nicholas Crone stated that T.H. looked "beat up," and he remembered her having blood on her clothes and an

abrasion on her swollen nose. There was ample evidence that T.H. had suffered physical harm.

{¶ 25} To obtain a conviction for domestic violence, it must also have been proven that Woodruff and T.H. were "family or household members." In pertinent part, the statute states that a "family or household member" is a spouse, a person living as a spouse, or a former spouse of the offender. R.C. 2919.25(F)(1)(i). It is undisputed that the two were never married, so the phrase "person living as a spouse" carries a great deal of importance; it is defined as a "person who is living or has lived with the offender in a common law marital relationship, who otherwise is cohabiting with the offender, or who otherwise has cohabited with the offender within five years prior to the date of the alleged commission of the act in question." R.C. 2919.25(F)(2). Cohabitation is the central element of the definition of a "person living as one's spouse." *State v. Woullard*, 2004-Ohio-3395, ¶ 72 (2d Dist.).

{¶ 26} T.H. testified that she and Woodruff had been in an on-again-off-again relationship for more than 20 years, but at the time of the incident in June 2022, they were not living together. She did state, however, that they had lived together in the past and did so as recently as 2021. The fact that they lived together the year before the incident means, according to statute, T.H. and Woodruff were "family or household members" because they "lived as spouses." There was abundant evidence that Woodruff violated R.C. 2919.25.

{¶ 27} Nevertheless, Woodruff argues that T.H.'s testimony should not have been believed due to her character issues and her alleged contradictory testimony, especially

on cross-examination. However, on appeal, this Court will not substitute its judgment for that of the trier of facts on the issue of witness credibility "unless it is patently apparent that the trier of fact lost its way in arriving at its verdict." *Smith*, 2013-Ohio-5345, at ¶ 16 (2d Dist.). "Because the factfinder . . . has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility." *State v. Jenkins*, 2018-Ohio-3697, ¶ 24 (2d Dist.), quoting *State v. Lawson*, 1997 WL 476684, *4 (2d Dist. Aug. 22, 1997). "The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." *Larson* at *4. Based on the record, we cannot say the jury lost its way. As to domestic violence, Woodruff's assignment of error is overruled.

<u>Having A Weapon While Under Disability</u>

{¶ 28} Woodruff's argument, again, is that this conviction should not stand because T.H. had credibility issues. It is the province of the jury, though, to credit (or not) witness testimony. With this count, however, even if the jury concluded that T.H. was completely unbelievable, the conviction still would not have been against the weight of the evidence, because there was testimony from officers that they saw Woodruff, a felon, with a firearm. Trial Tr. at 482, 483, 488. In fact, Detective Adams told the jury that Woodruff admitted over the phone that he was "a felon in possession of a gun." Trial Tr. at 395. As to having a weapon while under disability, the second assignment of error is overruled.

Firearm Specification

**{¶ 29}** With respect to the firearm specification, the State had have prove that Woodruff "had a firearm on or about [his] person or under [his] control while committing the offense and displayed the firearm, brandished the firearm, indicated that [he] possessed the firearm, or used it to facilitate the offense." R.C. 2941.145(A). Woodruff was convicted of the firearm specification related to the kidnapping of T.H.'s grandson. Although there was no evidence that Woodruff directly threatened the child with the gun, the State produced substantial evidence that he had the gun and would not let the child go until his demands were met. During hostage negotiations, Woodruff informed the officers that he had a gun, and he was threatening to commit "suicide by cop." After reviewing the evidence in the record as to the kidnapping count's gun specification, we cannot say that the jury clearly lost its way, or that this is the exceptional case in which the evidence weighed *heavily* against the conviction. It was reasonable for the jury to conclude that Woodruff used the firearm to facilitate the entirety of the day-long kidnapping ordeal. The assignment of error as to the gun specification is overruled.

## IV. Conclusion

**{¶ 30}** The judgment of the trial court will be affirmed.

. . . . . . . . . . . . .


WELBAUM, J. and HUFFMAN, J., concur.