[Cite as *State v. Barnett*, 2018-Ohio-4133.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 27660 |
| | : | |
| v. | : | Trial Court Case No. 2016-CR-1959 |
| | : | |
| DARRELL BARNETT | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . .

O P I N I O N

Rendered on the 12th day of October, 2018.

. . . . . . . . . .

MATHIAS H. HECK, JR., by MICHAEL J. SCARPELLI, Atty. Reg. No. 0093662, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee

CHRISTOPHER A. DEAL, Atty. Reg. No. 0078510, 2541 Shiloh Springs Road, Dayton, Ohio 45426
    Attorney for Defendant-Appellant

. . . . . . . . . . . . .

WELBAUM, P.J.

{¶ 1} Defendant-appellant, Darrell Barnett, appeals from his conviction and sentence in the Montgomery County Court of Common Pleas after a jury found him guilty of two counts of sexual battery against his 15-year-old daughter. For the reasons outlined below, the judgment of the trial court will be affirmed.

**Facts and Course of Proceedings**

{¶ 2} On August 18, 2016, the Montgomery County Grand Jury returned an indictment charging Barnett with two counts of sexual battery in violation of R.C. 2907.03(A)(5). The charges stemmed from allegations that Barnett sexually abused his 15-year-old daughter, AG, on two separate occasions in March 2016. Barnett pled not guilty to the charges and the matter proceeded to a jury trial.

{¶ 3} As it relates to this appeal, it is undisputed that Barnett and AG's mother ("Mother") were legally separated at the time of the alleged abuse. It is also undisputed that Barnett and Mother have five children together, four daughters and one son. Their daughters are HR and HL, who are both 18 years old, AG, who has since turned 16 years old, and E, who is 11 years old. Their only son, D, is 10 years old. Their oldest daughter, HR, is married and has one child.

{¶ 4} In January 2016, Mother and the five children moved out of Barnett's residence, which is located in the city of Moraine, Montgomery County, Ohio. Mother, HR, HL, D, and HR's husband and child moved in with Mother's father ("Grandfather"). Due to limited space in Grandfather's home, AG and E went to live with Mother's sister ("Aunt").

{¶ 5} After moving out of the residence, AG and her siblings began biweekly visits with Barnett. During these visits, four of the five children, HL, AG, E, and D, would spend Thursday through Sunday with Barnett at Barnett's residence. At trial, both AG and Mother testified that there was only one bed and two loveseat couches at Barnett's residence. AG also testified that when she and her siblings visited Barnett's residence, she and her two sisters, HL and E, would typically sleep on the floor of the "pink room" located upstairs. AG's brother, D, would sleep on one of the two couches located in the first-floor living room. Barnett would sleep in the first-floor bedroom where the only bed in the residence was located.

{¶ 6} The record indicates that AG and her siblings visited Barnett during the second week of March 2016. AG testified that, during this visit, she attempted to sleep on the second couch that was located in the first-floor living room because she had arthritis in her back and had difficulty sleeping on the floor. Both AG and Mother testified that AG had a chronic back problem for which she took medication. AG testified that at all relevant times she was taking Flexeril for her back pain. AG testified that she only took the Flexeril at night before going to bed because it made her very drowsy. Mother confirmed at trial that the Flexeril made AG drowsy.

{¶ 7} After moving downstairs to the first-floor living room, AG testified that her younger sister, E, asked to sleep on the couch. AG testified that she agreed to let E sleep on the couch and that Barnett thereafter invited AG to sleep with him in his bed. After accepting Barnett's invitation, AG testified that she recalled walking into Barnett's room, but did not specifically remember falling asleep. Although she did not remember falling asleep, AG testified that she woke up briefly in the middle of the night to Barnett

having his hand under her tank top and bra. AG testified that Barnett made skin to skin contact with her breast. Due to the Flexeril, AG testified that she struggled to stay awake and fell back asleep.

{¶ 8} Continuing, AG testified that, when she woke up a second time, her clothes had been removed and Barnett was naked and on top of her. AG claimed that Barnett was moving up and down with his whole body touching hers. During this time, AG testified that Barnett's penis was inside her vagina and that it was painful. AG testified that she knew what was happening, but could not do anything to stop Barnett from having sexual intercourse with her because she felt like she was in a "sleep coma." Trans. Vol. I (May 30, 2017), p. 152.

{¶ 9} AG testified that when Barnett eventually stopped, she was able to get out of bed and locate her clothes on the floor. AG then ran into the bathroom, locked the door, and cried. AG testified that she was terrified and did not know what to think. After crying in the bathroom for some time, she returned to the bedroom and went back to sleep.

{¶ 10} AG testified that she did not immediately tell anyone about what had happened to her because she was afraid of Barnett, who she claimed was very violent. AG explained that Barnett liked to yell and scream and that he had threatened to hurt her and her siblings. AG also claimed that Barnett had told her and her siblings that he could easily kill their mother. AG testified that she believed Barnett's threats because he had knives and guns in the house that he would use when making his threats.

{¶ 11} After the incident in Barnett's bedroom, AG told Mother, Aunt, and Grandfather that she did not want to go back to Barnett's house to visit Barnett. Unfortunately, Mother told AG that she had to visit Barnett again. When told this news,

AG claimed that she was terrified and that she cried and threw a fit in opposition.

{¶ 12} At trial, Aunt confirmed that AG was upset upon learning she had to visit Barnett again. Specifically, Aunt testified that AG was "hysterical" and that AG had "curled up in a ball, screaming and crying and shaking." Trans. Vol. II (June 1, 2017), p. 400-401. Aunt further testified that she had never seen AG behave like that before and that it was different than her usual general dislike for visiting Barnett. According to Aunt, during the timeframe of the abuse, AG's personality and behavior changed from bubbly and happy to withdrawn and depressed.

{¶ 13} Although she did not want to return to Barnett's residence, AG testified that she and her siblings went back to Barnett's residence for their biweekly visit on March 24, 2016. AG testified that a similar scenario occurred between her and Barnett during that visit. Specifically, AG testified that she attempted to sleep on the couch, her younger sister E wanted the couch, and that Barnett invited her to sleep with him in his bed. When asked why she again agreed to sleep with Barnett in his bed considering what had happened previously, AG testified that she slept there because her younger sister E offered to sleep with Barnett and AG wanted to protect E from Barnett.

{¶ 14} During this second incident, AG, who had taken her Flexeril before going to bed, testified that she once again woke up in the middle of the night to Barnett having his hand under her shirt and on her breast. AG testified that she later woke up to Barnett's naked body moving up and down on top of her. AG testified that her clothes were once again removed, Barnett's penis was inside her vagina, and it was painful. AG testified that she was more awake during this second incident and that she actively tried to push Barnett off her, but was unable to do so. AG also claimed that Barnett tried to kiss her,

but that she moved her head away.

{¶ 15} When Barnett stopped, AG testified that she once again ran into the bathroom. Thereafter, AG testified that her brother, D, came into the bedroom to sleep on the floor. AG claimed she then got back into bed with Barnett because she felt safer with D on the floor, as AG believed Barnett would not do anything to her while D was present.

{¶ 16} Shortly thereafter, while D was sleeping, AG testified that she told Barnett she was going to tell Mother what had happened. In response, AG claimed that Barnett said Mother would not believe her, that she should not tell anyone because he would go to prison, and that he would kill himself before going to prison. AG testified that she was terrified Mother would not believe her.

{¶ 17} AG testified that, the day after this second incident, she went to lunch with Mother and Barnett. During this time, AG testified that Mother and Barnett spoke with her about some inappropriate sexual text messages that they had recently discovered on her cell phone. When asked how she discovered the text messages, Mother testified that AG had left her cell phone at church the previous day and that the pastor's wife had given the cell phone to Aunt. The record indicates that Aunt looked through AG's cell phone and found that AG had been exchanging sexually explicit text messages with a 29-year-old male. Upon discovering the text messages, Aunt showed the messages to Mother, who then discussed the matter with Barnett. Mother testified that she and Barnett decided to report the matter to police and to confront AG about the messages over lunch.

{¶ 18} At lunch, Mother and Barnett told AG that they were disappointed in her and

that the police had both her cell phones.[1]  After being confronted by Mother and Barnett about the text messages, AG informed Mother that she had something important to tell her.  AG and Mother then drove to AG's grandmother's farm to feed their puppies.  During this trip, Mother asked AG what she wanted to tell her.  Mother testified that AG seemed upset and started crying uncontrollably in the car.  In response, Mother kept asking AG what was wrong, to which AG responded: "Mommy, I can't."  Trans. Vol. II (June 1, 2017), p. 368.  Mother also testified that AG told her that she "was going to hate her and * * * be mad at her."  *Id.* at 369.  Thereafter, Mother suggested AG write down what she wanted to say.  AG agreed, and when they returned home, AG wrote her mother a letter explaining what had happened with Barnett.

{¶ 19} At trial, AG read the letter into the record before the jury.  In the letter, AG wrote:

> I was raped.  Okay.  If that's what you want to call it, by Darrell Barnett, * *
> *.  A few months or weeks ago I slept in on your side and with headphones
> in and then in the middle of the night I woke up with his hand in my shirt and
> I got scared.  Before I could do anything I fell back asleep.  Then the next
> time his hand was in my pants.  This is so hard mom.  Then he took my
> clothes off as I was asleep.  I could barely function because I took some
> medicine to help me sleep, Flexeril, you know how it is sometimes * * * I

---

[1] The record indicates that AG had two cell phones.  Mother took away AG's first cell phone in January 2016 as punishment for AG sending "inappropriate messages to people."  Trans. Vol. II (June 1, 2017), p. 357.  Mother did not realize that AG had a second cell phone on which she was messaging the 29-year-old male.  Mother did not specify what kind of "inappropriate messages" AG was sending on her first phone nor did Mother indicate to whom AG was sending the inappropriate messages.

was so upset and scared, I didn't know what to do. I have cried over it every night because I don't know what to do. I don't know how to deal with it. I just want to die and I'm so scared, momma; that's why I (indiscernible) about coming here because I'm so scared it's going to happen, but I went— wasn't okay because you said there was no way out of it. Then a few nights ago it happened all over again. Mommy, I'm so sorry, it just—he is stronger than you think and I tried to get him to stop, but he wouldn't. I finally got him off and I was going—I was crying and he said 'What's wrong?' I told— and asked him maybe I should tell mom—we should tell mom. He said, 'No, it's our secret,' and I asked if it was bad and he said yes he could go to prison, but he was—said that he would kill himself before he goes. I don't know what to do anymore. I'm scared. I am so scared. He could kill you or kill me or himself. He said he would do everything like nothing happened, which I promise to God it did, mom, I'm so scared, I don't want it to happen again, mom, I don't know what to do.* * *

Trans. Vol. II (June 1, 2017), p. 299-300.

**{¶ 20}** After reading the letter, Mother took AG to the police station where AG was initially interviewed by Officer Mollie Hayden of the Moraine Police Department. Hayden testified that AG was upset, crying, scared, and emotional during the interview. Hayden also testified that AG became so emotional that she could not understand what AG was saying and could not complete the interview. As a result, Hayden called Detective Kenneth Lloyd, a more experienced officer, to complete the interview with AG.

**{¶ 21}** Detective Lloyd testified that AG was very upset and crying during his

interview.   After the interview, Detective Lloyd testified that he instructed Mother to take AG to the hospital for purposes of having a sexual assault exam conducted.   Detective Lloyd further testified that he obtained a DNA sample from Barnett, with Barnett's consent, and sent evidence technicians to Barnett's house to collect AG's underwear and the bedsheets from Barnett's bed.

{¶ 22} Per Detective Lloyd's instruction, Mother took AG to the hospital to have a sexual assault exam conducted.   The sexual assault nurse examiner, Kristi Teeters, testified that she had AG tell her in her own words what happened during the assault and wrote down what AG said word for word.   According to Teeters, AG told her "she was at her dad's house, that she couldn't sleep on the floor so she was asleep on the couch and that her other sister wanted to sleep on the couch so her dad told her she could come sleep in his room in his bed."   Trans. Vol. II (June 1, 2017), p. 469.   Teeters also testified that AG told her:

> We fell asleep back to back. * * * I was so tired.   I woke up with his hand in the front of my shirt.   I fell back asleep.   I woke back up with his hand down my pants.   I don't even remember how my clothes came off, and then he was on top of me or I was on top of him I don't even know what happened I tried to fight him off and get away, but he was stronger than me.   I finally got away and locked myself in the bathroom.

*Id.*   Teeters further testified that AG told her: "I went out to check on the other kids.   My dad tried to put his arm around me and I tensed up.   I told him I was telling mom, and he said no, don't.   [He] said he'd kill himself before going to prison."   *Id.*

{¶ 23} After speaking with AG, Teeters testified that she used a sexual assault kit

to examine AG, which included a vaginal and rectal exam, as well as taking various swabs from AG's body, including her vagina. Teeters testified that she then provided the completed sexual assault kit to law enforcement.

**{¶ 24}** Timothy Augsback, a forensic scientist in the DNA section of the Ohio Bureau of Criminal Investigation ("BCI"), testified that BCI received the sexual assault kit and the evidence collected by law enforcement for purposes of conducting DNA and seminal fluid testing. Augsback testified that his role was to compare the DNA profiles found on the evidence to known standards in order to determine whether the DNA came from a common source.

**{¶ 25}** Augsback testified that no DNA profile foreign to AG was found on AG's vaginal swabs and that the vaginal swabs were inconclusive for the presence of semen. When asked what the term "inconclusive" meant, Augsback explained that it meant there was a "faint positive result," which "indicates the presumptive test could have indicated the presence [of semen], but it was not able to be photographed, and you could not see the result." Trans. Vol. III (June 2, 2017), p. 529. Augsback, therefore, "could not say whether or not seminal fluid was in fact present." *Id.* at 528.

**{¶ 26}** Augsback further testified that AG's DNA was identified on four out of five pairs of underwear that were tested. Augsback testified that male DNA was also present on three pairs of the underwear on which AG's DNA was present. However, Augsback testified that the source of the male DNA could not be identified. Augsback further testified that the bedsheet tested positive for semen and contained a mixture of DNA from Barnett, AG and Mother.

**{¶ 27}** While the State was building its case against Barnett, sometime in the fall

of 2016, AG wrote a second letter to Mother in which AG offered to recant her allegations against Barnett.   In the letter, AG stated, in part, the following:

> I didn't lie about what if it was a nightmare and none of it was true.   I would never lie about something like that happening to me.   I have crazy wild dreams and nightmares and I have—I can't hardly remember parts of what happened because of it—because what if it never did.   I can't help living knowing I don't know what happened and I can't—cannot stand on trial, * * * no one believes me anyways, so why does it even matter what I say from this point on.   I just want what's best for everyone and everyone wants their dad around.   There is no evidence as to what happened to me, so just my word against his, and as long as everyone's happy and you are, then I'll just say I lied so everyone gets what they want, because I can't help living this way.

Trans. Vol. II (June 1, 2017), p. 292.

**{¶ 28}** When asked about this second letter, which was provided to Detective Lloyd by Mother, AG testified that the letter did not indicate that her allegations against Barnett were untrue.   According to AG, she wrote the letter because no one in her family believed that Barnett abused her and because she was scared.

**{¶ 29}** In addition to the foregoing testimony, the State called AG's psychotherapist, Frances Duncan.   Duncan, who has been treating AG since November 2016, testified that AG had been consistent in her account of what happened during the abuse in question.   Duncan also testified that the trauma from the sexual assault caused AG to suffer symptoms of post-traumatic stress disorder, including sleep disturbances,

anxiety, depression, and a sense of being damaged. Duncan further testified that there was a great deal of dysfunction in AG's family. From her sessions with AG, Duncan learned that Barnett had on numerous occasions threatened to kill the family, including the children. Duncan also testified that AG told her Barnett had threatened the children by sharpening knives and cleaning guns in front of them. Duncan also learned that Barnett had threatened to cut Mother into pieces and had a history of killing family pets.

{¶ 30} After the State rested its case, the defense presented two witnesses to testify on Barnett's behalf. The first witness, Bob Stinson, was a clinical psychologist who had never seen or treated AG. Stinson simply provided general testimony on the topics of delayed disclosures, false allegations, and the credibility of victims in sexual abuse cases.

{¶ 31} The second defense witness, Knoll Watson, was AG's physician. Dr. Watson testified that he had treated AG for depression since November 2015, for which he prescribed Zoloft. Watson also testified that AG had complained of back pain prior to March 2016 and that he had prescribed her Flexeril, which can cause drowsiness. Watson specifically testified that he prescribed AG ten tablets of Flexeril on March 4, 2016. Watson claimed it would be rare for Flexeril to cause incapacitation, but that it commonly makes people tired or sleepy. Following this testimony the defense rested its case.

{¶ 32} After closing arguments and jury instructions, the jury deliberated and found Barnett guilty of both counts of sexual battery. The trial court then sentenced Barnett to five years in prison on each count, to be served consecutively, for a total prison term of ten years. The trial court also designated Barnett a Tier III sex offender.

{¶ 33} Barnett now appeals from his conviction and sentence, raising five assignments of error for review.

**First Assignment of Error**

{¶ 34} Barnett's First Assignment of Error is as follows:

APPELLANT WAS DENIED HIS DUE PROCESS RIGHT TO A FAIR TRIAL WHEN THE TRIAL COURT PERMITTED THE STATE TO INTRODUCE, OVER OBJECTION, TESTIMONY REGARDING APPELLANT'S ALLEGED VIOLENT HISTORY.

{¶ 35} Under his First Assignment of Error, Barnett contends that the trial court erred by permitting the State to introduce testimony at trial regarding prior acts of violence and threats that he had made toward his family. Specifically, Barnett challenges AG's testimony that Barnett threatened her and her siblings with knives and guns and that Barnett had stated that he could easily kill Mother. Barnett also challenges the testimony of AG's counselor, Duncan, who testified that AG told her Barnett had sharpened knives and cleaned guns in front of his children, killed family pets, and threatened to kill his children and to cut Mother into pieces. Barnett claims this testimony was irrelevant, highly prejudicial, and inadmissible under Evid.R. 404(B).

{¶ 36} Evid.R. 404(B) provides, in relevant part, that:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of

mistake or accident.

**{¶ 37}** "The language of Evid.R. 404(B) indicates that the list of purposes for which evidence of other crimes, wrongs, or acts may be admitted is not an exhaustive listing." *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, 972 N.E.2d 528, ¶ 18. Rather, "evidence of other crimes, wrongs, or acts may be admissible for any purpose material to the issue of guilt or innocence as long as it is not being introduced for the purpose of showing the accused's propensity to commit bad acts." *State v. Boles*, 187 Ohio App.3d 345, 2010-Ohio-278, 932 N.E.2d 345, ¶ 49 (2d Dist.).

**{¶ 38}** "Generally, evidence of other acts is admissible if (1) it is offered for a purpose other than to prove the character of a person in order to show action in conformity with that character, Evid.R. 404(B), (2) it is relevant when offered for that purpose, Evid.R. 401, and (3) the danger of unfair prejudice does not substantially outweigh its probative value, Evid.R. 403." *State v. Goldblum*, 2d Dist. Montgomery No. 25851, 2014-Ohio-5068, ¶ 32, citing *State v. Kirkland*, 140 Ohio St.3d 73, 2014-Ohio-1966, 15 N.E.3d 818, ¶ 68, citing *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, ¶ 20.

**{¶ 39}** "A trial judge has considerable discretion to determine whether the specific [prior acts] evidence is of such a nature that it falls within one of the other purposes under Evid.R. 404(B) for which the evidence may be admitted." *Id.* at ¶ 32, citing *Morris* at ¶ 19. The Supreme Court of Ohio has stressed that "[u]nless the trial court has 'clearly abused its discretion and the defendant has been materially prejudiced thereby, this court should be slow to interfere' with the exercise of such discretion." *Kirkland* at ¶ 67, quoting *State v. Hymore*, 9 Ohio St.2d 122, 128, 224 N.E.2d 126 (1967). "A trial court abuses its

discretion when it makes a decision that is unreasonable, unconscionable, or arbitrary." (Citation omitted.) *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, ¶ 34.

{¶ 40} Based on the record before this court, we do not find that the trial court abused its discretion in permitting the State to introduce testimony regarding Barnett's prior violent and threatening behavior toward his family. At trial, AG testified that she did not initially disclose Barnett's abuse to anyone because Barnett was violent and she feared him. Given this testimony, the trial court reasonably concluded that the evidence of Barnett's prior violent acts and threats was admissible to show the basis of AG's fear of Barnett and that her fear was rational. As a result, the evidence of Barnett's prior behavior was not offered to prove that Barnett had bad character or that he acted in conformity with that bad character. Rather, evidence of Barnett's prior behavior gave substance to AG's claimed fear of Barnett and explained why AG delayed disclosing the sexual abuse. The prior bad acts evidence in question was therefore offered for a reason other than showing conformity with Barnett's character and was relevant in establishing the basis of AG's fear.

{¶ 41} Our finding is supported by prior decisions of this court wherein we held that a defendant's prior history of verbal or physical abuse toward a victim was admissible to demonstrate the victim's state of mind and/or to explain the victim's delay in reporting the defendant's criminal activity. *See, e.g., State v. Moore*, 2d Dist. Greene No. 2010 CA 13, 2011-Ohio-636, ¶ 20, 22 (holding that defendant's alleged prior bad acts were relevant to victim's fearful response to defendant's behavior and her state of mind, noting that defendant's "history of threatening, frightening, and abusing [the victim] * * * helped to

explain [the victim's] reluctance to call the police"); *State v. Crowley*, 2d Dist. Clark No. 2009 CA 65, 2009-Ohio-6689, \*3 (holding that defendant's prior domestic violence was admissible "to prove [the victim] had a reasonable basis to fear that [the defendant] would commit physical harm to her, as he had done in the past."); *State v. Kneisley*, 2d Dist. Montgomery No. 17027, 1999 WL 12730, \*1 (Jan. 15, 1999), (holding that prior incident of domestic violence was admissible for the limited purpose to show why the victim waited three days to report defendant's crime).

**{¶ 42}** Furthermore, since Barnett made AG's credibility a central issue of the case, the State was entitled to support AG's credibility with evidence that corroborated her claimed fear of Barnett. For that reason, as well as the reasons discussed more fully above, we find that the evidence of Barnett's prior violent acts and threats had great probative value that was not outweighed by unfair prejudice.

**{¶ 43}** For the foregoing reasons, Barnett's First Assignment of Error is overruled.

### Second Assignment of Error

**{¶ 44}** Barnett's Second Assignment of Error is as follows:

THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT REFUSED TO ALLOW ADDITIONAL TESTIMONY OR EVIDENCE OF [AG'S] SEXUALLY EXPLICIT TEXT MESSAGE EXCHANGES.

**{¶ 45}** Under his Second Assignment of Error, Barnett contends that the trial court erred in excluding testimony and evidence concerning sexually explicit text messages

that AG had exchanged with a 29-year-old male.[2]   Barnett claims the text messages were critical to his defense because he sought to prove that AG accused him of sexual abuse as retaliation for him and Mother discovering the text messages and taking away AG's cell phone as punishment.   According to Barnett, the text messages establish that AG had a motive for accusing him of sexual abuse and could "potentially explain" the inconclusive DNA/seminal fluid test results.   As a result, Barnett claims the trial court's decision to exclude testimony and evidence regarding the text messages infringed on his constitutional right to present his defense.

**{¶ 46}** "[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.' "   *Crane v. Kentucky*, 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986), quoting *California v. Trombetta*, 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984*).   Accord State v. Wesson*, 137 Ohio St.3d 309, 2013-Ohio-4575, 999 N.E.2d 557, ¶ 59.   However, "this constitutional right is not absolute and does not require the admission of all evidence favorable to the defendant." (Emphasis deleted.)   *State v. Swann*, 119 Ohio St.3d 552, 2008-Ohio-4837, 895 N.E.2d 821, ¶ 13, citing *United States v. Scheffer*, 523 U.S. 303, 308, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998).   (Other citations omitted.)   " 'In the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence.' "   *Id.* at ¶ 14, quoting *Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S.Ct.

---

[2] In his appellate brief, Barnett erroneously alludes to other sexually explicit text messages sent between AG and her boyfriend.   At trial, AG specifically denied sending any inappropriate text messages to anyone other than the 29-year-old-male, and there is nothing in the record indicating that AG sent sexually explicit text messages to her boyfriend as Barnett suggests.

1038, 35 L.Ed.2d 297 (1973).

{¶ 47} Pursuant to Evid.R. 402, all relevant evidence is generally admissible whereas irrelevant evidence is not. "Relevant evidence" is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. However, relevant evidence is not admissible and must be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 403(A).

{¶ 48} A trial court has broad discretion to admit or exclude evidence and its exercise of that discretion will not be disturbed on appeal absent an abuse of discretion. *State v. Norris*, 2d Dist. Montgomery No. 26147, 2015-Ohio-624, ¶ 14, citing *State v. Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, 781 N.E.2d 88, ¶ 43. As previously noted, "[a] trial court abuses its discretion when it makes a decision that is unreasonable, unconscionable, or arbitrary." *Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, at ¶ 34. When applying this standard, "an appellate court may not merely substitute its judgment for that of the trial court." *State v. Cassel*, 2016-Ohio-3479, 66 N.E.3d 318, ¶ 13 (2d Dist.), citing *Berk v. Matthews*, 53 Ohio St.3d 161, 169, 559 N.E.2d 1301 (1990).

{¶ 49} In this case, the parties agreed prior to trial that AG's conduct in exchanging sexually explicit text messages with a 29-year-old male was admissible evidence. However, the State argued, and the trial court agreed, that the actual *content* of the sexually explicit text messages was irrelevant to the allegations against Barnett. The trial court further determined that even if the content of the text messages was relevant,

the probative value of the content was substantially outweighed by unfair prejudice. Accordingly, the trial court prohibited the content of the text messages from being admitted at trial.

{¶ 50} Upon review of the text messages at issue, we do not find that the trial court abused its discretion in excluding the contents of the text messages at trial. The text messages did not pertain to the allegations of sexual abuse against Barnett and in no way furthered his defense strategy. Barnett's defense hinged on the fact that he had discovered AG had been exchanging sexually explicit text messages with a 29-year-old male. The record is clear that Barnett was not prevented from presenting that fact to the jury. Simply stated, the actual content of the text messages was of no consequence to Barnett's defense, as the content would not have made his claim of retaliation any more or less probable. In other words, presenting the contents of the text messages to the jury would have served no purpose other than to portray AG in a negative light. Therefore, based on the record before this court, it was not unreasonable for the trial court to conclude that the probative value of the text messages fell below the potential for unfair prejudice.

{¶ 51} For the foregoing reasons, Barnett's Second Assignment of Error is overruled.

## Third Assignment of Error

{¶ 52} Barnett's Third Assignment of Error is as follows:

THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT ALLOWED

TIMOTHY AUGSBACK TO TESTIFY REGARDING DNA AND SEMINAL

FLUID TESTING.

{¶ 53} Under his Third Assignment of Error, Barnett contends that the testimony of BCI forensic scientist Timothy Augsback violated his rights under the Confrontation Clause of the Sixth Amendment because scientists other than Augsback performed the DNA and seminal fluid testing on which Augsback based his expert opinions. According to Barnett, the State's failure to present the scientists who actually performed the DNA and seminal fluid testing ran afoul of the Confrontation Clause.

{¶ 54} The Sixth Amendment's Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him[.]" The United States Supreme Court has interpreted this to mean that the admission of an out-of-court statement of a witness who does not appear at trial is prohibited by the Confrontation Clause if the statement is testimonial, unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness. *Crawford v. Washington*, 541 U.S. 36, 53-54, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004); *State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, ¶ 34. However, "the Confrontation Clause 'does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.' " *State v. Ali*, 2d Dist. Clark No. 2014 CA 59, 2015-Ohio-1472, ¶ 17, quoting *Crawford* at 60. "[T]he core class of testimonial statements includes statements 'that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.' " *State v. Syx*, 190 Ohio App.3d 845, 2010-Ohio-5880, 944 N.E.2d 722, ¶ 23 (2d Dist.), quoting *Crawford* at 52.

{¶ 55} In *Williams v. Illinois*, 567 U.S. 50, 132 S.Ct. 2221, 183 L.Ed.2d 89 (2012),

the United States Supreme Court found no Confrontation Clause violation under circumstances very similar to the case at bar. In *Williams*, a forensic expert testified that a DNA profile was obtained from semen on a rape victim's vaginal swabs and that the DNA profile from the vaginal swabs matched a state-police-lab DNA profile that was generated from a sample of the defendant's blood. *Id.* at 62. The expert further testified that the DNA profile from the vaginal swabs was prepared by an outside laboratory. *Id.* On cross-examination, the expert confirmed that she did not conduct or observe any of the DNA testing on the vaginal swabs and that her testimony relied on the DNA profile produced by the outside laboratory. *Id.* In light of that fact, the defendant argued his confrontation rights were violated when the expert testified about a DNA profile that the expert had not prepared. *Id.* at 62-63. The report from the outside laboratory was not admitted into evidence, read during trial, or shown to the factfinder. *Id.* at 62.

{¶ 56} The Court in *Williams* held that the expert's testimony did not violate the Confrontation Clause "because that provision has no application to out-of-court statements that are not offered to prove the truth of the matter asserted." *Id.* at 57-58; *State v. Keck*, 137 Ohio St.3d 550, 2013-Ohio-5160, 1 N.E.3d 403, ¶ 13. The Court explained that "[w]hen an expert testifies for the prosecution in a criminal case, the defendant has the opportunity to cross-examine the expert about any statements that are offered for their truth. Out-of-court statements that are related by the expert solely for the purpose of explaining the assumptions on which that opinion rests are not offered for their truth and thus fall outside the scope of the Confrontation Clause." *Williams* at 58; *Keck* at ¶ 13.

{¶ 57} The present case is analogous to *Williams*. Similar to the facts of *Williams*,

Augsback testified that other scientists in his department conducted the necessary DNA testing to prepare DNA profiles from the sexual assault kit, bedsheets, and AG's underwear. Augsback confirmed that his role was not to conduct the DNA testing on those items, but to review and compare the resulting data to known standards in order to determine whether any of the DNA came from a common source. Like the expert in *Williams*, Augsback was able to explain the processes used to conduct the DNA testing that was performed by the other scientists. *See Williams* at 60. *Contrast State v. Hartman*, 2016-Ohio-2883, 64 N.E.3d 519, ¶ 82 (2d Dist.) (noting the DNA expert was unable to fully explain the reasoning for the process used to conduct the testing).

{¶ 58} The reports of the scientists who prepared the DNA profiles were not admitted into evidence. Rather, the record indicates that Augsback simply relied on the information in those reports to make his DNA profile comparisons and to render his conclusions about the source of DNA on each item. In other words, the DNA profiles prepared by the other scientists were not offered for their truth at trial, but were simply used by Augsback to explain how he reached his conclusions.

{¶ 59} Likewise, the results of seminal fluid testing on the vaginal swabs (which was also performed by another scientist) were used by Augsback to help him explain his conclusions regarding the source of DNA on the vaginal swabs. During trial, Augsback testified that AG was the single contributor of DNA and that no DNA profile foreign to AG was found on the vaginal swabs. When Augsback was asked whether there may not have been enough seminal fluid in AG's vagina to yield an additional DNA profile from the vaginal swabs, Augsback explained that the vaginal swabs were "inconclusive" for the presence of semen. Trans. Vol. III (June 2, 2017), p. 528. Augsback then explained

that the term "inconclusive" meant there was a "faint positive result" which "indicates the presumptive test could have indicated the presence [of semen], but it was not able to be photographed[.]" *Id.* at 529. Accordingly, Augsback "could not say whether or not seminal fluid was in fact present." *Id.* at 528. Contrary to Barnett's claim otherwise, the fact that Augsback defined the term "inconclusive" does not violate the Confrontation Clause because it is not an out-of-court, testimonial statement, but a statement based on Augsback's own knowledge of BCI lab terminology.

**{¶ 60}** Barnett claims that *Williams* is distinguishable from the present case because *Williams* involved a bench trial. We fail to see how that fact is relevant. Barnett also attempts to analogize this case to *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009) and *Bullcoming v. New Mexico*, 564 U.S. 647, 131 S.Ct. 2705, 180 L.Ed.2d 610 (2011), wherein the United States Supreme Court held that forensic reports could not be used as substantive evidence against the defendant unless the analyst who prepared and certified the reports was subject to confrontation. In *Melendez-Diaz* and *Bullcoming*, the forensic reports were introduced into evidence for the purpose of proving the truth of what they asserted, specifically, in *Bullcoming* that the defendant's blood alcohol level exceeded the legal limit and in *Melendez-Diaz* that the substance in question contained cocaine. *Williams*, 567 U.S. 50, 79, 132 S.Ct. 2221, 183 L.Ed.2d 89. The reports in *Melendez-Diaz* and *Bullcoming* therefore " 'contain[ed] a testimonial certification, made in order to prove a fact at a criminal trial.' " *Id.* at 66, quoting *Bullcoming* at 657.

**{¶ 61}** Unlike *Melendez-Diaz* and *Bullcoming*, the forensic reports relied on by Augsback in this case were not admitted into evidence and were not used to prove a fact

a trial. Simply put, *Melendez-Diaz* and *Bullcoming* did not address the specific issue in this case, i.e., whether the Confrontation Clause bars an expert from expressing a scientific opinion based on laboratory testing that the expert did not perform himself. *Williams*, however, answers this question in the negative. *Id.* at 58.

{¶ 62} Because the results of the DNA and seminal fluid tests performed by other scientists were not offered for their truth, but used to help Augsback explain his own scientific conclusions, all of which were subject to cross-examination, per *Williams*, there was no violation of the Confrontation Clause. Barnett's claim to the contrary lacks merit.

{¶ 63} Under his Third Assignment of Error, Barnett also argues that Augsback lacked the necessary expert qualifications under Evid.R. 702 to give an expert opinion regarding seminal fluid testing. The admissibility of expert testimony is a matter committed to the sound discretion of the trial court, and the trial court's ruling will not be overturned absent an abuse of that discretion. *Valentine v. Conrad*, 110 Ohio St.3d 42, 2006-Ohio-3561, 850 N.E.2d 683, ¶ 9. As previously noted, "[a] trial court abuses its discretion when it makes a decision that is unreasonable, unconscionable, or arbitrary." (Citation omitted.) *Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, at ¶ 34.

{¶ 64} Pursuant to Evid.R. 702, a witness may testify as an expert if all of the following apply:

> (A) The witness' testimony either relates to matters beyond the knowledge
>
> or experience possessed by lay persons or dispels a misconception
>
> common among lay persons;
>
> (B) The witness is qualified as an expert by specialized knowledge, skill,

experience, training, or education regarding the subject matter of the testimony;

(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. * * *

**{¶ 65}** Barnett contends that Augsback was not qualified as an expert in seminal fluid testing because he testified that he "[has] been competency tested in [seminal fluid testing], but * * * do[es] not maintain proficiency to perform it regularly[.]" Trans. Vol. II (June 1, 2017), p. 448. As a result, Barnett claims Augsback did not have the specialized knowledge, skill, experience, or training to testify regarding the seminal fluid test results. We disagree.

**{¶ 66}** Upon review, we do not find that the trial court abused its discretion in allowing Augsback to testify that seminal fluid test results on the vaginal swab were "inconclusive." We also find that the trial court did not abuse its discretion by allowing Augsback to testify that the term "inconclusive" meant there was a "faint positive result" that was insufficient to conclude whether seminal fluid was in fact present. As the record indicates, Augsback not only had specialized knowledge of the test results based on his employment at BCI, but also specifically testified that he was familiar with seminal fluid testing and that he was "competency tested" to conduct such tests. *Id.* at 448, 542. Although Augsback admitted that he did not have the proficiency to conduct seminal fluid testing regularly and typically does not perform the test at issue, given the limited nature of his testimony and his specialized knowledge as a BCI employee, we do not find that it was unreasonable for the trial court to permit Augsback to testify in this manner.

**{¶ 67}** The dissent agrees that Augsback's testimony did not violate the

Confrontation Clause and that Augsback was qualified to testify as an expert, but nevertheless believes a reversal and retrial is warranted based on Evid.R. 703. Barnett, however, failed to challenge Augsback's testimony under Evid.R. 703 in his appeal. It is not this court's duty to create an argument on Barnett's behalf. The burden of demonstrating error on appeal rests with the appellant. *Durrstein v. Tuttle-Durrstein*, 2d Dist. Greene No. 2005-CA-112, 2006-Ohio-2634, ¶ 13. S*ee also* App.R. 16(A)(7) (requiring briefs to have "[a]n argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies"); *State v. Billiter*, 2018-Ohio-733, 106 N.E.3d 785, ¶ 16 (4th Dist) ("it is not our function to construct the appellant's arguments for him"). Because Barnett failed to challenge Augsback's testimony under Evid.R. 703 in his appeal, we decline to sua sponte raise the issue.

**{¶ 68}** Even if Augsback's testimony about the DNA test results was prohibited under Evid.R. 703, any resulting prejudice was minimal given that the DNA test results were favorable to Barnett in that none of the results specifically indicated that Barnett's DNA was found on AG's vaginal swab or underwear. As previously noted, Augsback testified that no DNA profile foreign to AG was found on AG's vaginal swab and that the vaginal swab was inconclusive for the presence of semen. Although Augsback testified that "inconclusive" meant there was a "faint positive result" for seminal fluid on AG's vaginal swab, Augsback explained that he "could not say whether or not seminal fluid was in fact present." Trans. Vol. III (June 2, 2017), p. 528. On cross-examination, Augsback also testified that before testing the vaginal swab for seminal fluid, the vaginal swab was

first tested for spermatozoa and that "no sperm were identified" on the vaginal swab despite the seminal fluid testing coming back as inconclusive. *Id.* at 544-545. Augsback further clarified that if any spermatozoa had been identified, the test for seminal fluid would have been positive. *Id.* Moreover, Augsback testified that the male DNA found on three pairs of AG's underwear could not be identified. Accordingly, the male DNA in AG's underwear could not be linked to Barnett.

**{¶ 69}** Although Augsback testified that Barnett's bedsheet tested positive for semen and carried a mixture of DNA from Barnett, his wife, and AG, on cross-examination, Augsback clarified that the DNA on the bedsheet did not come from semen and that the test results do not determine when or how AG's DNA got on the bedsheet. *Id.* at 556-558. Given that a majority of the DNA test results were either inconclusive or failed to identify Barnett's DNA, this is not a case in which the DNA was a determining factor. While we recognize that the presence of unknown male DNA in AG's underwear and the presence of AG's DNA on Barnett's bedsheet lends some support to AG's claim of abuse, even without the DNA test results there is overwhelming evidence of Barnett's guilt. Specifically, the guilty verdict is supported by AG's testimony, AG's letters, and the testimony of AG's relatives and medical care providers. Therefore any error in allowing Augsback to testify regarding the DNA testing was harmless beyond a reasonable doubt, making a retrial unnecessary. *See State v. Williams*, 6 Ohio St.3d 281, 290, 452 N.E.2d 1323 (1983), quoting *Harrington v. California*, 395 U.S. 250, 254, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969)("evidence * * * improperly admitted in derogation of a criminal defendant's constitutional rights * * * is harmless 'beyond a reasonable doubt' if the remaining evidence alone comprises 'overwhelming' proof of defendant's guilt"). *Accord*

*State v. Jenkins*, 2d Dist. Montgomery No. 27701, 2018-Ohio-3697, ¶ 16.

**{¶ 70}** Because Augsback's testimony did not violate the Confrontation Clause and because the trial court did not abuse its discretion in permitting Augsback to testify as an expert, Barnett's Third Assignment of Error is overruled.

### Fourth Assignment of Error

**{¶ 71}** Barnett's Fourth Assignment of Error is as follows:

THERE WAS INSUFFICIENT EVIDENCE TO SUSTAIN THE CONVICTION FOR SEXUAL BATTERY AND THE VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

**{¶ 72}** Under his Fourth Assignment of Error, Barnett contends that there was insufficient evidence to support his conviction for two counts of sexual battery and that said conviction was against the manifest weight of the evidence.

**{¶ 73}** "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). "When reviewing a claim as to sufficiency of evidence, the relevant inquiry is whether any rational factfinder viewing the evidence in a light most favorable to the state could have found the essential elements of the crime proven beyond a reasonable doubt." (Citations omitted.) *State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997). "The verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier-of-fact."

(Citations omitted.)  *Id.*

{¶ 74} In contrast, "[a] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." (Citation omitted.) *Wilson* at ¶ 12. When evaluating whether a conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact " 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). "The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence." *State v. Adams*, 2d Dist. Greene Nos. 2013 CA 61, 2013 CA 62, 2014-Ohio-3432, ¶ 24, citing *Wilson* at ¶ 14.

{¶ 75} Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997). However, we may determine which of several competing inferences suggested by the evidence should be preferred. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

{¶ 76} As previously noted, Barnett is challenging his conviction for two counts of sexual battery. Sexual battery is codified under R.C. 2907.03. Section (A)(5) of that statute provides: "No person shall engage in sexual conduct with another, not the

spouse of the offender, when * * * [t]he offender is the other person's natural or adoptive parent, or a stepparent, or guardian, custodian, or person in loco parentis of the other person."   R.C. 2907.03(A)(5).

{¶ 77} The term "sexual conduct" is defined, in relevant part, as "vaginal intercourse between a male and female; * * * and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another.   Penetration, however slight, is sufficient to complete vaginal or anal intercourse."   R.C. 2907.01(A).

{¶ 78} In the present case, it is undisputed that Barnett is AG's biological father. The only determinative issue is whether Barnett engaged in sexual conduct with AG.   At trial, AG testified that sometime around the second week of March 2016, when she and three of her siblings were visiting Barnett for the weekend, Barnett invited AG to sleep with him in his bed due to AG having back problems and due to AG's younger sister, E, wanting to sleep on the couch where AG had been sleeping.   AG testified that she went to Barnett's bedroom and later woke up in the middle of the night naked in Barnett's bed with Barnett's naked body moving up and down on top of her.   AG specifically testified that Barnett's penis was inside her vagina and that it was painful.   AG testified that she knew it was happening, but could not do anything to get Barnett to stop because she was very tired and drowsy due to taking Flexeril for her back.

{¶ 79} AG further testified that a similar incident occurred while she and her siblings were spending the weekend at Barnett's house a short time thereafter.   AG testified that she once again tried to sleep on the couch, but that her back was hurting and that E wanted to sleep on the couch.   As a result, AG testified that Barnett again

invited her to sleep in his bed. AG claimed she once again went to sleep in Barnett's bed because her younger sister E offered to sleep there and AG wanted to protect E from Barnett. AG then testified that she once again woke up in the middle of the night naked with Barnett's naked body moving up and down on top of her. She also testified that Barnett's penis was inside her vagina and that it was painful. AG testified that during this second incident, she was more awake and tried to push Barnett off her, but that she was unsuccessful in doing so.

**{¶ 80}** Upon review, we find the foregoing testimony was sufficient to establish all elements of sexual battery under R.C. 2907.03(A)(5). AG's testimony clearly indicates that Barnett, her biological father, engaged in sexual conduct with her. Accordingly, Barnett's sufficiency claim lacks merit.

**{¶ 81}** Barnett's manifest weight claim also lacks merit. In support of this claim, Barnett argues that there was little credible evidence of his guilt. However, in addition to AG's testimony detailing the abuse, there was evidence of male DNA in two pairs of AG's underwear. Although there was not enough DNA to identify the source of the DNA, the fact that male DNA was present lends support to AG's claim of abuse. There was also evidence of AG's DNA on Barnett's bedsheets along with semen. Although Mother's DNA was also found on the bedsheets and Mother admitted to being intimate with Barnett on the bed,[3] the fact that AG's DNA was also present at the very least supports AG's claim that she was in Barnett's bed.

**{¶ 82}** In addition to the DNA evidence, the first letter AG wrote to Mother and the

---

[3] Mother testified that although they were legally separated, she and Barnett were still trying to work things out with their relationship and were at times intimate.

testimony from the medical professionals who interviewed AG indicated that AG's recollection of the incidents in question was fairly consistent. While there were portions of AG's testimony that were inconsistent with prior statements she had made during the investigation,[4] "[w]e will not disturb the jury's conclusions concerning the credibility of witnesses and their conflicting testimony unless it is so incredible that it defies belief." (Citation omitted.) *State v. Brady*, 2d Dist. Montgomery No. 18682, 2001 WL 1203003, *5 (Oct. 12, 2001). That is not the case here.

{¶ 83} In support of his manifest weight claim, Barnett also attempts to attack AG's credibility using the second letter AG wrote to Mother in which AG offered to recant her allegations against him. However, AG testified that the letter did not indicate that her allegations were untrue. According to AG, she wrote the letter because no one in her family believed that she had been abused and because she was scared. AG read the letter to the jury and specifically testified that letter did not say that the abuse did not happen, but that she would recant the allegations to appease her family. "[T]he jury was free to believe, or disbelieve, any part of the witnesses' testimony, and a conviction is not against the manifest weight of the evidence merely because the jury believed the prosecution's testimony." (Citation omitted.) *State v. Arega*, 2012-Ohio-5774, 983 N.E.2d 863, ¶ 30 (10th Dist.).

{¶ 84} Based on the foregoing, we do not find that this is the rare case where the evidence weighed heavily against the conviction and where the jury created a manifest miscarriage of justice. As previously noted, we also find that the State presented

---

[4] For example, AG testified that she did not remember reporting that Barnett put his hand in her pants when that fact was relayed to Detective Lloyd and the nurse who conducted the sexual assault examination.

sufficient evidence for a reasonable juror to find Barnett guilty of sexual battery.

{¶ 85} For the foregoing reasons, Barnett's Fourth Assignment of Error is overruled.

## Fifth Assignment of Error

{¶ 86} Barnett's Fifth Assignment of Error is as follows:

THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT SENTENCED

MR. BARNETT TO TEN (10) YEAR[S] IN PRISON AND ORDERED THAT

BOTH COUNTS BE SERVED CONSECUTIVELY.

{¶ 87} Under his Fifth Assignment of Error, Barnett contends that the trial court "abused its discretion" in sentencing him to consecutive, five-year prison terms for each of his two sexual battery offenses.   For the following reasons, Barnett's claim lacks merit.

{¶ 88} As a preliminary matter, we note that this court no longer applies an abuse of discretion standard when reviewing felony sentences.   The Supreme Court of Ohio has made clear that felony sentences are to be reviewed in accordance with the standard set forth in R.C. 2953.08(G)(2).   *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, ¶ 10, 16.   R.C. 2953.08(G)(2) provides as follows:

The appellate court may increase, reduce, or otherwise modify a sentence

that is appealed under this section or may vacate the sentence and remand

the matter to the sentencing court for resentencing.   The appellate court's

standard for review is not whether the sentencing court abused its

discretion.   The appellate court may take any action authorized by this

division if it clearly and convincingly finds either of the following:

(a) That the record does not support the sentencing court's findings under division (B) or (D) of section 2929.13, division (B)(2)(e) or (C)(4) of section 2929.14, or division (I) of section 2929.20 of the Revised Code, whichever, if any, is relevant;

(b) That the sentence is otherwise contrary to law.

**{¶ 89}** Pursuant to the plain language of R.C. 2953.08(G)(2), we may vacate or modify Barnett's sentence only if we "determine by clear and convincing evidence that the record does not support the trial court's findings under relevant statutes or that the sentence is otherwise contrary to law." *Marcum* at ¶ 1. In this case, the trial court made findings under one of the "relevant statutes," specifically, R.C. 2929.14(C)(4).

**{¶ 90}** Pursuant to R.C. 2929.14(C)(4), a trial court may impose consecutive sentences if it determines that: (1) consecutive service is necessary to protect the public from future crime or to punish the offender; (2) consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public; and (3) one or more of the following three findings are satisfied:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single

prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

R.C. 2929.14(C)(4)(a)-(c).

**{¶ 91}** " '[A] trial court is required to make the findings mandated by R.C. 2929.14(C)(4) at the sentencing hearing and incorporate its findings into its sentencing entry, but it has no obligation to state reasons to support its findings.' " *State v. Bittner*, 2d Dist. Clark No. 2013-CA-116, 2014-Ohio-3433, ¶ 11, quoting *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, ¶ 37. In this case, the record establishes that the trial court made all the required consecutive-sentence findings under R.C. 2929.14(C)(4) at the sentencing hearing and in the sentencing entry. Specifically, the trial court found that:

Consecutive sentences are necessary to protect the public from future crime. Consecutive sentences are not disproportionate to the seriousness of [Barnett's] conduct and to the danger [Barnett] poses to the public. At least two of the multiple offenses were committed as part of one or more course of conduct, and the harm caused by two or more of the multiple offenses was so great and unusual that no single prison term can adequately reflect the seriousness of [Barnett's] conduct.

*See* Trans. Vol. III (June 28, 2017), p. 750; Termination Entry (June 30, 2017), Montgomery C.P. No. 2016-CR-1959, Docket No. 243, p. 1.

{¶ 92} "[W]here a trial court properly makes the findings mandated by R.C. 2929.14(C)(4), an appellate court may not reverse the trial court's imposition of consecutive sentences unless it first clearly and convincingly finds that the record does not support the trial court's findings." *State v. Withrow*, 2d Dist. Clark No. 2015-CA-24, 2016-Ohio-2884, ¶ 38.

{¶ 93} After a thorough review of the record, we do not clearly and convincingly find that the record does not support the trial court's consecutive-sentence findings. The record indicates that Barnett's offenses were severe and disturbing given that he sexually abused his 15-year-old daughter, AG, while she was entrusted into his care and while AG was under the effect of medication. Barnett engaged in this conduct on two separate occasions and, according to the trial court, showed a dismissive attitude toward the offenses. The record further indicates that Barnett tried to cover up his actions by telling AG that no one would believe her if she disclosed the abuse and that he would kill himself before going to prison for his actions. Barnett has several children, some of whom are younger and even more vulnerable than AG, and they, along with the public, are in need of protection from Barnett. As a result, we cannot say the record does not support the trial court's decision to impose consecutive sentences.

{¶ 94} We also do not clearly and convincingly find that Barnett's 10-year prison sentence is otherwise contrary to law. *See* R.C. 2953.08(G)(2)(b). "In general, a sentence is not contrary to law when it is within the authorized statutory range and the trial court states that it has considered the principles and purposes of sentencing and the seriousness and recidivism factors." *State v. Bradley*, 2d Dist. Greene No. 2017-CA-64, 2018-Ohio-3192, ¶ 5, citing *State v. Smith*, 2d Dist. Montgomery No. 26307, 2016-

Ohio1269, ¶ 25.

{¶ 95} In this case, Barnett's two five-year prison sentences are within the authorized statutory range provided in R.C. 2929.14(A)(3)(a). The trial court also stated at the sentencing hearing that it had considered the purposes and principles of sentencing in R.C. 2929.11 and weighed the seriousness and recidivism factors in R.C. 2929.12. Accordingly, Barnett's prison sentence is not clearly and convincingly contrary to law.

{¶ 96} "[A]n appellate court may vacate or modify any sentence that is not clearly and convincingly contrary to law only if the appellate court finds by clear and convincing evidence that the record does not support the sentence." *Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, at ¶ 23. Here, we find no clear and convincing evidence establishing that the record does not support Barnett's sentence. Again, the record indicates that the nature of Barnett's offenses were severe and disturbing, as they were committed against his biological daughter while she was entrusted into his care and vulnerable due to being on medication that made her somnolent.

{¶ 97} For the foregoing reasons, Barnett's Fifth Assignment of Error is overruled.

## Conclusion

{¶ 98} Having overruled all assignments of error raised by Barnett, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

HALL, J., concurs.

FROELICH, J., dissenting:

{¶ 99} Barnett's third assignment of error focuses on whether the testimony of BCI forensic scientist Timothy Augsback violated the Confrontation Clause and whether Augsback was qualified to testify about certain matters as an expert under Evid.R. 702. I agree that there was no Confrontation Clause violation and that the trial court did not abuse its discretion in allowing Augsback to testify as an expert. However, Augsback's testimony *was* objectionable under Evid.R. 703, since he was not permitted to rely on DNA profiles created by other forensic scientists when those profiles were not admitted into evidence at trial.

{¶ 100} Evid.R. 703 addresses the bases of an expert's opinion: "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by the expert or admitted in evidence at the hearing." "Pursuant to Evid.R. 703, an expert may not base his opinion on hearsay but must rely upon his own personal knowledge of facts and data submitted as evidence in the case." *Dellagnese v. Sorkin*, 9th Dist. Summit Nos. 13036 and13229, 1988 WL 37646, *3 (Mar. 30, 1988).

{¶ 101} The bases for expert opinions under Rule 703 of the Ohio Rules of Evidence are more limited than permitted under Fed.R.Evid. 703. The federal rule provides that "[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, *they need not be admissible for the opinion to be admitted.* * * *" (Emphasis added.)

"The purpose of [Federal] Rule 703 is to make available to the expert all of

the kinds of things that an expert would normally rely upon in forming an

opinion, without requiring that these be admissible in evidence * * *. In short, through Rule 703, the law is catching up with the realities of professional life." *Mannino v. Int'l Mfg. Co.*, 650 F.2d 846, 851 (6th Cir. 1981). Thus, "great liberality is allowed the expert in determining the basis of his opinions," *Eggert v. Meritain Health, Inc.*, 428 Fed.Appx. 558, 567 (quoting *Mannino*, 650 F.2d at 853) (alteration omitted), and an expert may base his opinion on facts or data that would be inadmissible in evidence, including hearsay evidence*, see Kingsley Assocs., Inc. v. Del-Met, Inc.,* 918 F.2d 1277, 1286-87 (6th Cir. 1990) (quoting Fed. R. Evid. 703).

*Ryans v. Koch Foods, LLC*, Case No. 1:13-cv-234-SKL, 2015 WL 11108937, *4 (E.D.Tenn. July 16, 2015).

**{¶ 102}** At trial, Augsback testified about how a DNA comparison is done: (1) extract DNA from a sample, (2) quantify the amount of DNA present, (3) amplify the DNA, (4) create a DNA profile, and (5) compare DNA profiles. Augsback stated that, after the preparation of DNA profiles, he can compare the profiles to determine if they come from a common source. Augsback acknowledged that, in this case, another forensic scientist performed the preliminary steps of the analysis and created the DNA profiles from those samples, where possible.

**{¶ 103}** In addition to his Confrontation Clause objection, Barnett argued at trial that Augsback's testimony raised hearsay issues, because Augsback did not conduct the DNA tests on the specific items (underwear, bed sheets, etc.) to obtain the DNA profiles and, instead, relied on other scientists' data. (Trial Tr. at 437-441). The results of the tests upon which Augsback relied to render his opinions were not offered or admitted into

evidence at trial. The trial court allowed Augsback's testimony because it did not violate the Confrontation Clause. However, the trial court should have sustained the hearsay objection pursuant to Evid.R. 703.

{¶ 104} Further, although the results of the DNA tests did not conclusively establish that Barnett committed the offenses, the admission of Augsback's testimony was not harmless beyond a reasonable doubt. With respect to the vaginal swab, Augsback found that "no DNA profile foreign to [AG] was found." Beyond the comparison of DNA profiles, Augsback testified, over objection, regarding the male DNA found on AG's vaginal swab. He stated that "the test for seminal fluid was inconclusive. So I could not say whether or not seminal fluid was present" on the vaginal sample. (Trial Tr. at 528.) Augsback went on to say, however, that "[i]nconclusive for seminal fluid per our protocol is when there is a result that is a faint, positive result that cannot be documented photographically, so we cannot show a positive result." (Trial Tr. at 529.) Augsback clarified that a "faint positive" is different than a negative result. *Id.*

{¶ 105} Augsback further testified that AG's DNA was found on four pairs of underwear. For three of those pairs of underwear, male DNA was also detected in the sample, but not enough that he could include or exclude any known individuals. (Trial Tr. 530-531.) Two samples were tested from Barnett's fitted sheet; both samples had Barnett's DNA. One sheet sample was inconclusive for AG and her mother due to relatedness, and the second sample included AG and her mother.

{¶ 106} Augsback's testimony that there was a faint positive on the vaginal swab from AG – a conclusion reached by another forensic scientist, not Augsback -- was offered for the truth of the matter asserted, i.e., to establish the existence of male DNA on AG's

vaginal swab, not merely as a basis for his ultimate conclusion that no comparison could be made to Barnett. The State further offered Augsback's testimony of the presence of AG's DNA along with Barnett's DNA on the bed sheet to corroborate AG's allegation. The prosecutor argued during closing argument:

> And then there's the DNA. Even without the DNA you've got enough to convict here. But what did you hear from Tim Augsback? The vaginal swab that was taken from [AG], during the sexual abuse exam was tested, and it came back as inconclusive for seminal fluid. Now, what Tim Augsback said that means, "inconclusive" means there is a faint positive for seminal fluid. Not strong enough to say for certain, but it was enough to prompt other testing. And then you have the sheets. These are the bedsheets from Defendant's bed, where he had sex with his daughter. And on one very small area of that sheet the lab was able to identify a mixed DNA profile. And what were the results of that mixture? It was his sperm mixed with his daughter's DNA, exactly where she said he had sex with her.

(Trial Tr. 710)

{¶ 107} After defense counsel attempted to minimize the importance of the DNA evidence during closing argument, the prosecutor argued in rebuttal:

> And on that first day when [AG] told her mom about what he did to her, she had no idea that this defendant's sperm would be found mixed with her DNA in the middle of the bed, where she told you this happened. But that's what happens when you tell the truth; the physical evidence supports you.

Now, Defense wants to talk about the DNA and the fact that, well, Mom's DNA is found there too. Well, isn't that ironic, the two women that this defendant has had sex with, both are mixed with his sperm, in his bed, in the same spot. That supports what [AG] told you.

And the underwear that were collected, how do we not know those were [AG's]? Because what Officer Hayden testified to was this defendant pointed out [AG's] pile of clothes. He's the one who said those were [AG's] underwear. And the underwear that [AG] had at her father's house had male DNA in them.

You know, and I think it's important to mention this again, the defendant's reaction to all of this. He's calling [Mother] to explain why his DNA might be on or in his daughter. He's calling the detective after he knows his DNA has been taken to find out the results. Those are the actions of a man who's worried that maybe he left some DNA behind.

(Trial Tr. 728-729.)

**{¶ 108}** Because the trial court erred in admitting the testimony of Augsback and the error was not harmless, I would reversed Barnett's conviction and remand for a new trial.

Copies sent to:

Mathias H. Heck, Jr.
Michael J. Scarpelli
Christopher A. Deal
Hon. Barbara P. Gorman